UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TAMARA S. PADGETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:15-cv-01567-LJM-DML |
| | ) | |
| CAROLYN W. COLVIN Acting | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Tamara S. Padgett ("Padgett") requests judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), who denied Padgett's application for Disability Insurance Benefits ("DIB") benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416 & 423. Padgett asserts that (a) the decision of Administrative Law Judge ("ALJ") was not supported by substantial evidence and (b) the ALJ failed to give proper weight to various medical sources. The Commissioner contends that substantial evidence supports the ALJ's findings and that the ALJ properly distributed weight to each of the medical opinions in the record.

## I.  BACKGROUND

### A.  PROCEDURAL HISTORY

Padgett filed a Title II application for a period of disability and disability insurance benefits on October 2, 2010, alleging disability beginning April 23, 2009, due to depressive

1

disorder, anxiety, restless leg syndrome, an undetermined immune disorder (due to a high ANA count), chronic persistent itching, and chronic persistent insomnia.  R. at 150-151, 161.   The claim was denied initially on January 11, 2011, R. at 85, and upon reconsideration on April 4, 2011.  R. at 86.  Padgett timely requested a hearing before the ALJ on April 14, 2011.  R. at 94-95.

On October 11, 2011, the ALJ held a hearing, at which Padgett, who was represented by counsel, and a vocational expert testified.  R. at 40-84.  On January 23, 2012, the ALJ found that Padgett was not disabled.  R. at 34.  The Appeals Council denied Plaintiff's request for review on April 26, 2012.  R. at 1.  On June 14, 2012, Padgett filed a complaint in the United States District Court for the Southern District of Indiana, R. at 699, and by stipulation of the parties, the District Court remanded the matter to the Commissioner on December 12, 2012.  R. at 703.

On remand, in its January 31, 2013 order, the Appeals Council noted that Padgett had filed subsequent applications for a period of Disability and Disability Insurance Benefits and Supplemental Security Income ("SSI") on July 13, 2012.  R. at 717-718.  The Appeals Council additionally indicated that the State Agency issued a favorable determination on October 15, 2012, finding Padgett was disabled beginning May 9, 2012. R. at 717.  The Appeals Council reviewed the favorable determination, and after finding that it was supported by the substantial evidence of record, affirmed the State Agency's determination.  *Id.*

In its January 31, 2013, order, the Appeals Council further noted that adjudication was still required for the period before May 9, 2012, vacated the ALJ's January 23, 2012, decision, and remanded the case to the ALJ.  *Id.*  The Appeals Council indicated that a

2

remand was necessary in part because the ALJ did not properly address the opinion of Therapist Kay E. Whitehead ("Ms. Whitehead"), or the treating opinion of Kelly Rhoadarmer, M.D. ("Dr. Rhoadarmer").   *Id.*   The Appeals Council stated that the ALJ improperly dismissed Ms. Whitehead's opinion as the opinion of an unacceptable medical source without further support and improperly discredited Dr. Rhoadarmer's opinion by saying it was inconsistent with other evidence she had provided.   *Id.*

The ALJ held hearings on October 18, 2013, and May 21, 2014, R. at 613-667;[1] and issued a decision on December 19, 2014, finding that Padgett was not disabled.  R. at 544-562.  Padgett made a timely request for review for the Appeals Council, and the Appeals Council denied Padgett's request for review on August 8, 2015, making the ALJ's decision the final decision of the Commissioner.  R. at 535-541.

On October 5, 2015, Padgett filed the instant appeal pursuant to 42 U.S.C. § 405(g).

### B.  AGE, EDUCATION, WORK HISTORY & PADGETT'S PERCEPTION OF HER IMPAIRMENTS

Padgett was thirty-six years old at the time of the alleged onset date.  She has a high school and college education.  Padgett has past relevant work experience as a computer systems analyst, quality assurance analyst, and senior test engineer for a publishing company.  R. at 53, 660.

At the October 11, 2011, hearing, Padgett testified that she had symptoms of depression in April 2009, a couple of months after the passing of her grandmother.  R. at

---

[1] A medical expert, vocational expert, and Plaintiff did not testify at the October 11, 2013, hearing because it was determined that the evidence of record was not complete.  R. at 620-622.  As a result, the May 21, 2014, supplemental hearing was held, wherein all three parties testified.  R. at 627.

55.  She often had difficulty sleeping and concentrating, frequently had crying spells, and experienced extreme nervousness and anxiety around people.  R. at 56.  Padgett testified that it would take her a long time to complete mundane household chores and that she would often need to take a break to watch television to take her mind off of things.  *Id.* She further stated that she avoided being around people, despite being an extrovert before being encumbered by her condition.  R. at 57.  Padgett testified that her condition also created tension with her husband, who occasionally felt the need to hide Padgett's medication to prevent possible intentional overdosing and took over household tasks that Padgett could not complete.  R. at 61-63.

Padgett claimed that she typically could drive herself but occasionally had difficulty driving if she had been upset or did not have enough sleep.  R. at 66.  She stated that she spent approximately two and a half to three hours actively watching television and substantial time on her computer checking email and visiting chat rooms each day.  R. at 67-68.  She also occasionally paid bills from her computer.  *Id.*

Padgett believed she would only struggle to work because she often felt too tired and too depressed to get out of bed.  R. at 70.  She said it was hard for her to stop thinking about the negative events of her life or negative situations unless she could watch a television show or do something else that would take her mind to another place.  *Id.* Padgett also believed she would likely miss approximately four days of work each month because of her condition.  R. at 71.

In addition to testifying about her mental state and fatigue, Padgett testified that she experienced a chronic itching condition that was caused by a severe allergy to dust mites.  R. at 73-74.  She also stated that while the record reflects some evidence of

4

alcohol use, she only used alcohol to help her sleep.  R. at 74.  Padgett further indicated that her prescribed medications help her to some degree, but she admitted that the rest of her treatment and improvement must also be a result of therapy.  R. at 76.

At the May 21, 2014, hearing, Padgett again testified before the ALJ regarding her condition.  R. at 651-659.  Padgett testified that she continued to experience fatigue, extreme daytime sleepiness, and inconsistent sleep patterns, and that she was later diagnosed with narcolepsy.  R. at 651-654.  Padgett also stated at the May 21, 2014 hearing that she often struggled to drive to appointments because of her fatigue.  R. at 653, 657-658.  Padgett estimated that she would not have been alert for 50-60% of the day if she had been working between April 2009 and May 2012 because of her sleepiness and fatigue, but she also stated that she was fully productive and was never disciplined for sleepiness or inattentiveness while working in 2008.  R. at 652-653, 656-657.

## C.  RELEVANT MEDICAL EVIDENCE

### 1.  Treatment Records

Padgett began seeking medical treatment on September 15, 2008 from St. Vincent Internal Medicine Residency ("St. Vincent") to address issues with chronic itchiness (i.e., pruritis) and insomnia.  R. at 287-288.  Padgett also received treatment for anxiety from St. Vincent beginning on October 9, 2008.  R. at 289-290.  On March 16, 2009, following the death of her grandmother, Padgett received a diagnosis for depressive disorder from St. Vincent.  R. at 295.  Padgett continued to seek treatment from St. Vincent through September 24, 2010, for her depression, insomnia, anxiety, and chronic itchiness.  *See generally*, R. at 287-345.

On May 24, 2010, Padgett was admitted to St. Vincent Stress Center for inpatient treatment related to her depression.  R. at 278-287.  Padgett received an Axis I diagnosis of major depressive disorder and an Axis III diagnosis of "itching-unknown etiology, insomnia, [and] restless leg syndrome" there.  R. at 279.  Padgett was discharged from the St. Vincent Stress Center on August 17, 2010, as a result of "excessive no-shows/cancellations" for treatments during her inpatient program.  R. at 282.   Padgett was admitted to the St. Vincent Stress Center a second time on September 8, 2010, for further inpatient treatment for depression.  R. at 355-382.  Upon discharge from the St. Vincent Stress Center on October 13, 2010, Padgett was referred to Ms. Whitehead and Diane Martin, M.D. ("Dr. Martin"), for further depression treatment.  R. at 357.

Padgett began treatment with Ms. Whitehead on October 15, 2010.  R. at 396. Padgett saw Ms. Whitehead twenty-two times between October 2010 and March 2011 for depression treatments.  *See generally*, R. at 367-401, 444-447.  Ms. Whitehead noted on December 20, 2010, that Padgett had regressed in her treatment largely because she had not followed through in attending group therapy sessions, had isolated herself in her home, had maintained contact with others through her computer and occasionally by phone, and had attempted suicide.  R. at 396.  Ms. Whitehead further stated that Padgett is depressed but also showed manifestations of borderline personality disorder.  *Id.*

In an update letter dated March 24, 2011, Ms. Whitehead indicated that Padgett had seen some improvement after attending grief group therapy treatments, as requested.  R. at 441.  Ms. Whitehead noted that Padgett's grief was beginning to resolve and that there had been no further suicide attempts.  *Id.*  Ms. Whitehead further noted

that Padgett began going outside of her home more often and began exercising more frequently.  *Id.*

On June 6, 2011, Ms. Whitehead completed a Mental Impairment Questionnaire, in which she gave Padgett an Axis I diagnosis of major depression and an Axis II diagnosis of post-traumatic stress disorder ("PTSD").  R. at 460-465.  Within the Mental Impairment Questionnaire, Ms. Whitehead communicated her opinion regarding Padgett's condition by responding to close-ended questions and by providing more detailed answers to open-ended questions.  *Id.*  Ms. Whitehead stated in the Mental Impairment Questionnaire that Padgett would be limited in her ability to work based on her depression and PTSD.  *Id.*

While seeking treatment from Ms. Whitehead, Padgett also saw Dr. Martin for her depression beginning October 26, 2010.  *See generally*, R. at 425-435, 450-459.  At her initial consultation with Dr. Martin, Padgett rated her worst depression as a nine on a ten-point scale.  R. at 429.  Padgett continued to see Dr. Martin through March 2011, and, despite seeing some improvements during treatment, Dr. Martin consistently noted that Padgett continued to struggle with grief and depression throughout her treatment.  *See generally*, R. at 425-435, 450-459.

On June 12, 2011, Padgett began receiving treatment from Aspire Indiana Behavioral Health System ("Aspire").  *See generally*, R. at 504-523.  Padgett's treatment from Aspire between June 12, 2011, and September 28, 2011, included individual and group therapy from several sources, including Dr. Rhoadarmer.  *Id.*  Aspire diagnosed Padgett with major depression and borderline traits.  R. at 515, 518.  On October 5, 2011, Dr. Rhoadarmer completed a Mental Impairment Questionnaire.  R. 524-529.  In the

Mental Impairment Questionnaire, Dr. Rhoadarmer indicated that Padgett had a fair prognosis but also noted that Padgett had "no useful ability to function" to complete a normal work day or work week without interruptions from psychologically based symptoms, to accept instructions and respond appropriately to criticism from supervisors, or to deal with normal work stress.  R. at 524, 526.

   In addition to her depression, insomnia, restless leg syndrome, and anxiety, Padgett also sought treatment for other physical conditions.  On April 8, 2008, Pinkus Goldberg, M.D. discovered that Padgett had several allergies, including an allergy to dust mites, resulting in chronic itchiness, and had an abnormal count of antinuclear antibodies ("ANA"), resulting in an unknown immune disorder.  R. at 238-257.

   The record from St. Vincent Women's Hospital further noted that Padgett had a high ANA count on September 14, 2009.  R. at 312.

   After filing the instant application, Padgett was examined by Kuimil Mohan, M.D. ("Dr. Mohan"), on July 26, 2012, and Dr. Mohan noted that Padgett was "referred for chronic daytime sleepiness, nonrestorative sleep, and chronic fatigue since [sic] many years."  R. at 1010, 1323.  Dr. Mohan later diagnosed Padgett with narcolepsy on September 10, 2013.  R. at 1105.

### 2.  Social Security Administration Consultative Exams

   On December 3, 2010, as part of the prior application for disability benefits, Padgett underwent a psychological evaluation by Carl Hale, M.D. ("Dr. Hale").  R. at 389-394.  At that time, Dr. Hale noted that Padgett's affect was flat and that her mood was depressed.  R. at 393.  Dr. Hale further indicated that Padgett denied having suicidal or homicidal ideation, intent, or plan and displayed slowed motor activity, limited eye contact,

and a normal rate of speech.  *Id.*  Padgett was also cooperative with Dr. Hale, and her thought processes appeared coherent and relevant.  *Id.*  Dr. Hale also stated that Padgett reported that she grooms herself and drives when necessary but that she tends to lay in bed all day and have her husband do much of the housework.  *Id.*  Dr. Hale gave Padgett an Axis I diagnosis of major depression and generalized anxiety disorder and an Axis III diagnosis of an unknown immune disorder and "possible restless leg syndrome."  R. at 393-394.

State reviewing psychologists Benetta Johnson, Ph.D., and B. Randal Horton, Psy.D., reviewed the medical record and found only that Padgett was moderately limited in her ability to maintain attention and concentration for extended periods, to complete a normal work day or work week without interruptions from her psychologically based symptoms and perform at a consistent pace without unreasonable rests, and to interact appropriately with the general public.  R. at 407-408, 448.  These reviewing psychologists further stated that Padgett could relate on at least a superficial, ongoing basis with co-workers and supervisors, could be on task for sufficient periods of time, and could manage the stresses of work-related tasks. R. at 409.

State reviewing physicians J.V. Cocoran, M.D., and M. Ruiz, M.D., also reviewed the medical record and agreed that there is no evidence within the record indicating that Padgett had a severely limiting physical impairment.  R. at 395, 449.

### D.  MEDICAL EXPERT TESTIMONY

Medical expert, Dr. James Brooks ("Dr. Brooks"), testified at the May 21, 2014, hearing.  R. at 629-650.  Dr. Brooks, a licensed clinical psychologist, indicated that he was an independent contractor paid by the Commissioner to testify regarding Padgett's

alleged disability.  R. at 629.  Dr. Brooks testified that he did not have any prior contact with Padgett and that his testimony was based on his review of the medical evidence of record.  R. at 630.  After summarizing the medical evidence of record, R. at 631-634, Dr. Brooks stated that Padgett had a primary diagnosis of borderline personality disorder and a secondary diagnosis of depression symptoms.  R. at 634.  Although the medical record mentioned PTSD, Dr. Brooks testified that he did not believe this to be a valid diagnosis for Padgett because it was not well documented in the record.  *Id.*  He also stated that he could not make any comment as to whether Padgett suffered from narcolepsy because he was only testifying about Padgett's psychological issues.  R. at 644.  Dr. Brooks indicated that these diagnoses would have been in effect since the alleged onset date. R. at 649.

Dr. Brooks further stated that he believed Padgett had moderate restrictions with daily living activities, marked difficulties with maintaining social functioning, and mild difficulties with maintaining concentration, persistence, and pace.  R. at 635.  He clarified that Padgett would likely struggle more with maintaining intense relationships, such as familial relationships, than with maintaining superficial relationships with others.  R. at 636.  Additionally, Dr. Brooks testified that he did not see any evidence in the record indicating that Padgett met the paragraph C criteria for Listing 12.04.  R. at 637.  With regard to Dr. Rhoadarmer's statements that Padgett had no useful ability to function in a normal work day, accept instructions, or deal with normal work stress, Dr. Brooks stated that Dr. Rhoadarmer's opinion was difficult to analyze and was inconsistent with the fair prognosis she had given Padgett.  R. at 637, 647.

Dr. Brooks testified that Ms. Whitehead's statements indicated that Padgett was not very invested in her treatment, R. at 638, and that a lack of investment in treatment could have a tremendous impact of Padgett's ability to improve.  R. at 639.

In response to questions from Padgett's attorney, Dr. Brooks declared that the diagnosis of borderline personality disorder also indicates that the person will suffer from anxiety, depression, and possibly panic symptoms.  R. at 641.  Dr. Brooks further stated that a person suffering from borderline personality disorder with marked difficulties in maintaining social functioning would likely see these difficulties manifest with supervision, following orders, and adhering to work procedures.  R. at 643, 645.

### E.  VOCATIONAL EXPERT TESTIMONY

Vocational Expert, Gail Corn ("VE"), also testified at the May 21, 2014, hearing.  R. at 659-663.  The ALJ asked the VE to consider a hypothetical individual with a high school education that could perform work at all exertional levels and could have superficial contact (meaning no sustained conversations) with coworkers.  R. at 660.  The VE testified that such an individual could not perform Padgett's past relevant work because such jobs would require more than superficial contact with others.  R. at 660-661.  The ALJ then asked the VE to consider the same hypothetical person and added that the hypothetical person also could not have superficial contact with supervisors.  R. at 661.  The VE stated that an individual meeting this revised hypothetical could be a cashier, with 23,000 available jobs in Indiana and over 1 million available jobs nationally; a cleaner, with 10,000 available jobs in Indiana and 561,000 available jobs nationally; or a hand packager, with 8,000 available jobs in Indiana and 325,000 available jobs nationally.  *Id.*

The VE further stated that all of these jobs require light exertion and were unskilled (SVP: 2) work.  *Id.*

In response to questions from Padgett's counsel, the VE testified that all of the jobs described above would require the individual to take instruction from supervisors and respond appropriately to changes in the work setting.  R. at 662.

### F.  RELEVANT ASPECTS OF THE ALJ'S DECISION

The ALJ found that Padgett last met the disability insured status requirements for purposes of DIB eligibility on December 31, 2013.  R. at 550.  He also found that Padgett had not engaged in substantially gainful activity during the period from her alleged onset date of April 23, 2009, through May 8, 2012.  *Id.*  Further, the ALJ found that Padgett suffered from severe impairments of depressive disorder and borderline personality disorder.  R. at 550-551.  The ALJ declined to consider Padgett's history of allergic rhinitis and chronic itching as a severe impairment because it did not result in any functional limitations or restrictions with more than a minimal effect on Padgett's ability to perform basic work activities.  R. at 551.  He also declined to consider Padgett's alleged impairments of PTSD and narcolepsy as "medically determinable" conditions, requiring consideration.  *Id.*  The ALJ reasoned that PTSD was not a medically determinable condition because the only diagnosis of the condition in the medical evidence of record was from Ms. Whitehead, a therapist who is not recognized as an acceptable medical source, and because the record did not otherwise establish a diagnosis of PTSD.  *Id.*  The ALJ also stated that narcolepsy could not be a medically determinable condition for consideration in this instance because Padgett was not formally diagnosed with narcolepsy until after May 9, 2012.  *Id.*

12

Additionally, the ALJ concluded that Padgett did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). *Id.* In making this conclusion, the ALJ considered Padgett's mental impairments under Listings 12.04, paragraph B and paragraph C, and 12.08, paragraph B.[2] R. at 551-555. Under paragraph B, the ALJ considered restrictions on Padgett's activities of daily living, which he found were only mildly restricted; social functioning, which he found were markedly affected; and difficulties with concentration, persistence, or pace, which he found were mildly affected. R. at 552-553. The ALJ found that Padgett had not experienced any episodes meeting the definition of decompensation. R. at 554. Under paragraph C, the ALJ found no evidence in the record to support a finding under the "C" criteria. *Id.*

After consideration of the entire record, the ALJ determined that Padgett had the residual functional capacity to perform a full range of work at all exertional levels but with a non-exertional limitation, allowing only superficial contact with supervisors and co-workers (i.e., no sustained conversations). R. at 555. The ALJ also found that Padgett could perform productive work tasks for an average of 95-100% of an eight-hour work day, not including the typical morning, lunch, and afternoon breaks. *Id.*

The ALJ concluded that Padgett's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Padgett's statements regarding the intensity, persistence, and limiting effects of these symptoms were not

---

[2] The paragraph B criteria for Listings 12.04 and 12.08 are identical. Listing 12.08 does not have a paragraph C option.

entirely credible.  *Id.*  Specifically, the ALJ looked at Padgett's prior testimony about her mental symptoms and medical evidence indicating that Padgett was not invested in her treatment.   R. at 555-556.   He noted that Dr. Brooks believed the best predictor of successful outcomes is an investment of energy and focus to treatment by the client, and Padgett's treatment records between August 2010, and December 2010, indicated that she did not attend outpatient treatments or group grief therapy sessions and improved only after participating in such treatments.  R. at 555-557.  The ALJ found Padgett's statements throughout the record to be only partially credible because of the inherent difficulties in objectively verifying her alleged limitations in daily activities and in attributing the degree of limitation to the claimant's medical condition, rather than other reasons, in light of the medical evidence and all other factors discussed.  R. at 557.  The ALJ further reasoned that the extent of the symptoms and limitations alleged by Padgett were not supported by medically acceptable clinical and diagnostic techniques.  *Id.*  The ALJ also found that the testimony of Padgett's husband was partially credible under the same reasoning.  *Id.*

The ALJ gave Dr. Rhoadarmer's treating opinion from October 5, 2011, little weight.   R. at 557-558.   The ALJ rejected Dr. Rhoadarmer's opinion because Dr. Rhoadarmer presented her conclusions in a check-box format with nonspecific rationale and analysis in support, making her opinions functionally equivalent to answering close-ended questions.  R. at 558.  The ALJ also rejected Dr. Rhoadarmer's opinion because her conclusion that Padgett had "no useful ability to function" was inconsistent with the fair prognosis she gave to Padgett.  *Id.*  The ALJ further reasoned that Dr. Rhoadarmer's

opinion must be rejected because she implicitly stated that Padgett was disabled, which is a decision reserved for the Commissioner.  *Id.*

The ALJ also considered Ms. Whitehead's evaluation from June 6, 2011, which stated that Padgett could carry out simple instructions but had serious limitations in most mental abilities and aptitudes needed for skilled work, somewhat credible.  R. at 558-559. Although Ms. Whitehead also employed a check-box format, indicating marked difficulties in social functioning and in maintaining concentration, persistence, or pace, the ALJ gave greater weight to Ms. Whitehead's opinion than Dr. Rhoadarmer's opinion because Ms. Whitehead offered more specific observations and had more contact with Padgett.  *Id.*

In contrast, the ALJ gave substantial weight to the non-examining opinion of Dr. Brooks because of his medical specialty and because he provided a longitudinal review of the medical evidence at the hearing level.  R. at 558.  The ALJ also gave probative weight to the state disability determination medical professionals because their conclusions as to the nature and severity of Padgett's impairments were considered non-examining source expert opinion evidence.  R. at 559.

The ALJ adopted the VE's opinion that Padgett could not perform any of her past relevant work.  *Id.*  The ALJ also adopted the VE's opinion that a person with Padgett's age, education, work experience, and residual functional capacity could perform jobs as a Cashier, Cleaner, and Hand Packager, all of which were available in significant numbers in the state and national economies.  R. at 560-561.  Accordingly, the ALJ concluded that Padgett was not disabled at any time from April 23, 2009, through May 8, 2012.  R. at 561.

## II. <u>STANDARD</u>

To be eligible for DIB or SSI,[3] a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). To determine whether or not a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

I. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

II. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

III. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

IV. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

V. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, but then it shifts to the Commissioner at the fifth step. *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review

---

[3] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1505 *et seq.* The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq.* For convenience, only the DIB regulations are set forth herein.

of the Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner.  *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the ALJ's findings if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ.  *Nelson*, 131 F.3d at 1234.

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  *See also*, *Craft*, 539 F.3d at 673.  Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning."  *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).  *See also*, *Craft*, 539 F.3d at 673 (stating that not all evidence needs to be mentioned, but the ALJ "must provide an 'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004))).  An ALJ's articulation of his analysis enables the Court to "assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review."  *Craft*, 539 F.3d at 673.

### III. ANALYSIS

Padgett asserts that the ALJ failed to consider her alleged impairments of PTSD and narcolepsy because the ALJ improperly classified these impairments as non-medically determinable conditions.  Dkt. No. 17 at 18-19.  In support of this position, Padgett argues that the ALJ should have considered the medical evidence indicating that Padgett was diagnosed with narcolepsy on September 10, 2013, to determine whether she was entitled to disability benefits prior to May 9, 2012.  Dkt. No. 21 at n. 3.  Padgett further claims that the ALJ classified her PTSD as a non-medically determinable impairment without a clear explanation and by disregarding the diagnosis of PTSD from Ms. Whitehead.  Dkt. No. 17 at 18.  The Commissioner contends that the ALJ correctly deemed Padgett's alleged PTSD and narcolepsy as non-medically determinable impairments because Padgett did not receive medical diagnoses from an acceptable medical source for either of these conditions for the time between April 23, 2009, and May 8, 2012.  Dkt. No. 20 at 9.

The Court agrees with the Commissioner that the substantial evidence supports the ALJ's decisions to classify Padgett's alleged PTSD and narcolepsy as non-medically determinable impairments prior to May 9, 2012.  Although Padgett was diagnosed with narcolepsy in 2013, there is nothing within the medical records to indicate that the condition existed within the time period at issue between April 23, 2009, and May 9, 2012. In order for post-dated medical evidence to be considered, "the evidence must relate to the claimaint's [sic] condition 'during the relevant time period encompassed by the disability application under review.'" *Bush v. Astrue*, 571 F. Supp. 2d 866, 876 (N.D. Ill. 2008) (quoting *Schmidt v. Barnhart*, 395 F. 3d 737, 742 (7th Cir. 2005)).  Although Dr.

Mohan stated that Padgett experienced symptoms, such as "chronic daytime sleepiness, nonrestorative sleep, [and] chronic fatigue," for "many years" on July 26, 2012, R. at 1105, nothing in Dr. Mohan's reports prove these symptoms equated to narcolepsy between April 23, 2009, and May 9, 2012.  Furthermore, statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment.  20 C.F.R. § 404.1528(a).  Because there is no clear indication from the medical records that this diagnosis applied to Padgett during the time period at issue, the ALJ could reasonably conclude that narcolepsy was not a medically determinable impairment in this instance.

Furthermore, the ALJ's decision to classify Padgett's alleged PTSD as a non-medically determinable impairment is sufficiently supported by the substantial evidence of record.  Evidence from "acceptable medical sources," such as licensed physicians or psychologists, is necessary to determine whether a claimant has a medically determinable impairment.  20 C.F.R. § 404.1513(a).  The ALJ reasoned that because (1) the only diagnosis of PTSD came from a source other than an "acceptable medical source," (2) PTSD was otherwise rarely and inconsistently noted in the record, and (3) Dr. Brooks' testimony did not support a diagnosis of PTSD, PTSD could not be a medically determinable condition in this instance.  R. at 551.  In light of this evidence within the record, it was reasonable for the ALJ to also find that Padgett's alleged PTSD was not a medically determinable impairment and did not need be considered further to determine whether Padgett was disabled.

However, Padgett also asserts that the ALJ failed to consider several other alleged impairments found within the medical record prior to May 9, 2012, including insomnia, restless leg syndrome, anxiety, an undetermined immune disorder (due to a high ANA

19

count), and chronic itchiness, when determining Padgett's residual functional capacity and disability.  Dkt. No. 17 at 18.  Padgett notes that the ALJ failed to address many of these conditions in his decision despite addressing them in his prior decision from January 23, 2012.  *Id.* at 19.  The Commissioner argues only that the ALJ discussed Padgett's itchiness and did not address any of the other above impairments.  Dkt. No. 20 at 13.

This Court agrees with Padgett that the ALJ did not adequately address these conditions in his decision.  Although the ALJ made reference to Padgett's chronic itchiness, R. at 550, he ignored Padgett's insomnia, anxiety, restless leg syndrome, and unknown immune disorder (due to a high ANA count) and failed to explain any impact they may have on Padgett's residual functional capacity, even though the medical records repeatedly demonstrate that Padgett did in fact suffer from these conditions prior to May 9, 2012.  R. at 255-257, 279, 290-292, 297, 308.  The ALJ is required to consider all of the evidence presented when determining whether a claimant is disabled.  *Herron*, 19 F.3d at 333.  Even if the ALJ did not believe that any of these conditions were relevant or would impact Padgett's residual functional capacity or disability determination, he must articulate his reasoning for this belief in order to provide "an 'accurate and logical bridge'" between the medical evidence of record and his conclusion. *Craft*, 539 F.3d at 673 (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)).  Because the ALJ ignored these conditions, the Court concludes the ALJ erred in this aspect of his analysis.

Padgett further argues that the ALJ failed to provide any analysis for the factors in 20 C.F.R. § 404.1527(c), when he gave less weight to the opinions of Dr. Rhoadarmer and Ms. Whitehead but substantial weight to Dr. Brooks and probative weight to the state

reviewing psychologists and physicians in determining Padgett's residual functional capacity.  Dkt. No. 17 at 22-24.  Padgett asserts that the ALJ wrongly discredited the opinion of Dr. Rhoadarmer, a treating medical source, because the check-box format of her opinions seemingly made findings reserved for the Commissioner.  *Id.* at 22; Dkt. No. 21. at 10-11.  Furthermore, Padgett claims the ALJ wrongly criticized Ms. Whitehead's findings because they offered only generalized insights.  Dkt. No. 17 at 23.  As a result, Padgett believes that the ALJ's distribution of weight amounts to "cherry picking from the opinions [in the way that] would best serve to deny the claimant a finding of disability."  Dkt. No. 21 at 9.

The Commissioner asserts that the ALJ gave proper weight to Dr. Rhoadarmer's opinion because her opinion, presented in check-box format, did not provide any specific rationale or analysis to support her conclusions and that her finding that Padgett lacked a useful ability to function was inconsistent with her overall prognosis.  Dkt. No. 20 at 11.  The Commissioner also argues that the ALJ's treatment of Ms. Whitehead's opinion was consistent with 20 C.F.R. §404.1527(d)(2) and SSR 96-2p.  Dkt. No. 20 at 12.  Furthermore, the Commissioner justifies the substantial weight given to Dr. Brooks' testimony and the probative weight given to state reviewing physician and psychologist opinions by reasoning that their opinions are based on their medical specialties and longitudinal review of the medical evidence.  *Id.* at 13.

In this respect, the Court also concludes that the ALJ opinion is insufficient because it fails to adequately explain his reasons for distributing weight to the various medical sources of record.  The Court cannot trace the path of the ALJ's reasoning for discrediting Dr. Rhoadarmer's opinion by claiming the check-box format of her opinion

makes findings reserved for the Commissioner.  Furthermore, the ALJ did not adequately explain his reasoning for giving greater weight to non-treating physicians, such as Dr. Brooks and the state medical professionals, than to treating sources, such as Dr. Rhoadarmer and Ms. Whitehead, even though 20 C.F.R. § 404.1527(c) supports giving greater weight to examining and treating sources.  Even though the Appeals Council remanded the ALJ's January 23, 2012, decision in part because the ALJ did not properly address alleged inconsistencies with Dr. Rhoadarmer's October 5, 2011, opinion and other evidence she had provided with specific citations, R. at 717, the ALJ still failed to explain why Dr. Rhoadarmer's opinions are inconsistent with other evidence that she provided.

## IV.  CONCLUSION

For the reasons stated herein, the Court has concluded that Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, erred in her decision to deny Plaintiff Tamara S. Padgett's application for Disability Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416 & 423 and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g).  The Court will enter judgment accordingly.

IT IS SO ORDERED this 23d day of November, 2016.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jennifer M. Hess
Jen.Hess@HHDLegal.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov